IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | | |
|---|---|---|---|
| LEON ALFANO, INDIVIDUALLY AND | § | | |
| AS REPRESENTATIVE OF THE ESTATE | § | | |
| OF PAMELA DARLENE WEATHERBY, | § | | |
| NELDA ALFANO, | § | | |
| DAREN C. WEATHERBY, and | § | | |
| JUSTIN WEATHERBY, | § | | |
| | § | | |
| Plaintiffs | § | NO. _____ | |
| | § | | |
| v. | § | (ECF) | |
| | § | | |
| CORRECTIONS CORPORATION | § | | |
| OF AMERICA, | § | | |
| | § | | |
| Defendant. | § | | |

## PLAINTIFFS' ORIGINAL COMPLAINT

### THE PARTIES

1.  Plaintiff Leon Alfano is the father of Pamela Darlene Weatherby, who died while under the care of Defendant Corrections Corporation of America.  Plaintiff Nelda Alfano is the mother of Pamela Darlene Weatherby, who died while under the care of Defendant Corrections Corporation of America.  Mr. and Mrs. Alfano reside in  Big Spring, Howard County, Texas.

2.  Plaintiffs Daren C. Weatherby and Justin Weatherby are the natural children of Pamela Darlene Weatherby, who died while under the care of Defendant Corrections Corporation of America.  Daren C. Weatherby is currently serving with the United States Military in Afghanistan but maintains his mailing address in Big Spring, Howard County, Texas.  Justin Weatherby resides in Stanton, Martin County, Texas.

3.  Defendant Corrections Corporation of America ("CCA") is a private for-profit corporation that contracts with the State of Texas to operate the Dawson State Jail.  CCA is a Maryland corporation with its principal place of business at 351 West Camden Street, Baltimore, Maryland  21201.  CCA can be served through its registered agent for service of process in Texas, CT Corporation System, 350 N. St. Paul St., Suite 2900, Dallas, Texas  75201-4234.

### JURISDICTION AND VENUE

4.  This is a suit for damages brought by the Plaintiffs against the Defendant for violations of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment of the United States Constitution pursuant to Title 42 § 1983.  Plaintiffs are not prisoners as defined by 42 U.S.C. § 1997e(h) and therefore, are not subject to 42 U.S.C. § 1997e's provisions regarding the exhaustion of administrative remedies.

5.  This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because it involves a federal question, namely, violations of the United States laws and of the Eighth and Fourteenth Amendments of the United States Constitution.

6.  This Court has personal jurisdiction over CCA because CCA does business in the state of state of Texas pursuant to a contract with the State of Texas under which it operates the Dawson State Jail in Dallas, Texas.  CCA thus has sufficient minimum contacts with the State of Texas.

7.  Plaintiffs also bring supplemental claims under the Texas Wrongful Death and Survival Statutes.  As such, Plaintiffs invoke the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a).

8. Venue is proper in this district pursuant to U.S.C. § 1391(b)(2) because substantially all of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## BENEFICIARIES UNDER TEXAS WRONGFUL DEATH AND SURVIVAL STATUTES

9. The statutory beneficiaries of Pamela D. Weatherby are entitled to bring this action in account of her wrongful death. Therefore, Plaintiffs bring this action pursuant to § 71.004 of the Tex. Civ. Prac. & Rem. Code on behalf of the following beneficiaries of the decedent:

| Name | Relationship to Decedent |
|------|--------------------------|
| Leon Alfano | Father |
| Nelda Alfano | Mother |
| Daren Weatherby | Son |
| Justin Weatherby | Son |

10. Plaintiffs bring this action pursuant to the Texas Wrongful Death Statute and the Texas Survival Statute regarding the death of Weatherby. Weatherby died intestate. All of the statutory heirs of Weatherby have been joined as parties to this suit as follows: Daren Weatherby and Justin Weatherby as Ms. Weatherby's only natural or adoptive children, and Leon Alfano and Nelda Alfano, as parents. No administration of the Weatherby estate is necessary or pending. All heirs needed are before the Court in this present action.

## THE FACTS

11. Weatherby was an unstable insulin dependent diabetic ("brittle diabetic") who died in the custody of Defendant CCA on July 14, 2010—barely two months after she was first incarcerated—due to CCA's deliberate indifference to her serious medical needs.

12. On May 12, 2010, Weatherby was sent to the Woodman State Jail, the Diagnostic Intake facility for female offenders.  Woodman initially assessed and provided care to Weatherby.  As is required by the Correctional Managed Care Formulary as promulgated by the Correctional Managed Care Pharmacy and Therapeutics Committee of the Texas Department of Criminal Justice, Woodman performed a complete physical examination, laboratory evaluation, and established a comprehensive treatment plan for Weatherby, including ordering the appropriate diet for her condition and prescribing the appropriate medications.  Weatherby was then enrolled in the Chronic Care Clinic, where she received specialized oversight for her diabetic condition, as required by the Correctional Managed Care Formulary.

13. Late on May 28, 2010, Weatherby was transferred to her unit of assignment ("UOA") the Dawson State Jail, a private facility which is owned and operated by CCA. Only hours after she arrived at Dawson, Weatherby was found totally unresponsive because of severe hypoglycemia (blood sugar of 24 mg/dl – normal 70-110).  The following day, a second episode of severe hypoglycemia was documented with blood sugar to 46 mg/dl.

14. Unlike Woodman, CCA did not follow the Correctional Managed Care Formulary as promulgated by the Correctional Managed Care Pharmacy and Therapeutics Committee of the Texas Department of Criminal Justice.  When it was obvious Weatherby was not responding to her current treatment regimen, CCA did not send her to the Chronic Care Clinic for re-evaluation.  In addition, CCA did not follow the treatment plan established

by Woodman, including providing her with appropriate diet and the proper medications and dosages. CCA also did not attempt to send Weatherby for referral to a specialist.

15. In June 2008, moreover, the Correctional Managed Health Care Committee of the State of Texas issued its Policy Manual regarding Therapeutic Diets for those incarcerated in Texas state jails. The express purpose of the Policy is to "establish guidelines for the ordering and provision of therapeutic diets according to the orders of the treating provider." The Committee established the following guidelines:

I.   Therapeutic diets are provided at all facilities for patients whose medical and/or dental conditions require dietary management as ordered by a qualified health care provider (physician, dentist or midlevel practitioner). Qualified health care staff will consult with the patient not later than 30 days after the order depending on the need and duration of the therapeutic diet ordered. Dietary literature will be made available during these consultations.

II.  Therapeutic diets are evaluated for nutritional adequacy by a registered or licensed dietitian annually or whenever a substantial change in the menu is made.

III. **All diabetics will receive nutritional counseling from a qualified health care provider initially and as needed and must be documented in the health record.**

IV.  Each facility will maintain a current copy of the Nutrition Manual, which contains procedures for providing therapeutic diets. The UTMB Chief Dietitian will be responsible for providing any pertinent revisions and updated literature to each facility.

V.   If an offender refuses to follow the diet ordered by a qualified health care provider, and wants to eat from the regular food line, he/she must submit a Sick Call Request asking that the ordered diet be discontinued. The Food Service Staff cannot allow the offender patient to eat from the regular food line, until they have been notified by the medical department that the offender patient has been deleted from the special Therapeutic diet list.

The medical provider will perform and document in the medical records that counseling on the ordered diet was provided. The offender patient must sign a Refusal of Treatment form that acknowledges he/she has received the counseling and is aware of the risks associated with the refusal. Offender patients refusing the Therapeutic diet will be instructed on how to self-select appropriate foods from the regular food line. This education/instruction must be documented in the medical record. Snacks will be provided, if clinically indicated, for Insulin Dependent diabetic offender patients who have refused therapeutic diabetic diet.

Dietary needs will be reviewed by the medical providers in the appropriate Chronic Care Clinic.

VI.    Based on availability, wrist identification bands may be used to identify Diet for Health offenders.

16. The Policy then goes on to list the following references for use when inmates like Weatherby require a special diet:

1. U.S. Dept. of Agriculture/Dept. of Health & Human Services "MyPyramid Food Guidance System" at www.mypyramid.gov or J Nutr Educ Behav 2006; 38 Suppl.
2. USDA Dietary Reference Intakes, 2006
3. The American Heart Association Diet and Lifestyle Recommendations Revision 2006. Circulation 2006; 114(1):82.
4. 2008 Standards for Health Services in Prisons, NCCHC Standard P-F-02, Medical Diets (important)
5. TDCJ-ID Administrative Directive AD-05.25, Medical and Religious Diets
6. TDCJ-ID Food Service Division Policy Manual
7. American Diabetes Association Exchange Lists for Meal Planning - Revised 2003
8. American Dietetic Association Nutrition Care Manual
9. ACA Standard 4-4318 (Ref. 3-4299) Therapeutic Diets (Mandatory)

17. CCA as a general matter was required to adhere to the Correctional Managed Care Formulary as promulgated by the Correctional Managed Care Pharmacy and Therapeutics Committee of the Texas Department of Criminal Justice and to the Correctional Managed Health Care Committee Policy Manual regarding Therapeutic Diets.  As evidenced by its treatment of Weatherby, CCA had a pattern and practice of failing to implement processes and procedures required by the Correctional Managed Care Formulary and failed to supervise and train those CCA agents responsible for ensuring that the Correctional Managed Care Formulary and other standards for diabetics were followed at Dawson State Jail.

18. On June 1, 2010, Weatherby told prison officials that she has a history of diabetic comas and diabetes-induced diarrhea, that she could not eat starchy food, and that she was adamant about receiving the proper medications, including Lente insulin.  Dawson officials refused and instead gave her medication which led to a series of life-threatening diabetic comas.

19. On June 7, 2010 Weatherby again complained that she was not getting the proper food and demanded insulin and Depend diapers for her diarrhea.  Prison officials inexplicably noted that it was "doubtful insulin is necessary."

20. On the morning of June 8, 2010, CCA took Weatherby--a brittle diabetic--off her scheduled dosages of insulin and placed her on oral Glyburide with supplemental sliding scale insulin, which was wholly inappropriate for Weatherby and contrary to standards established by the American Diabetes Association, the American Association of Clinical Endocrinologists, and the Correctional Managed Care Formulary.

21. Indeed, according to a fact sheet titled *Hypoglycemia* published by the National Institute of Diabetes and Digestive and Kidney Diseases at the National Institute of Health, "hypoglycemia can occur as a side effect of some diabetes medications, including insulin and oral diabetes medications – pills – that increase insulin production, such as …. Glyburide."  In other words, giving Glyburide and insulin together can induce life threatening acute metabolic complications.  That is exactly what CCA did to Weatherby.

22. On the evening of June 8, 2010, Weatherby's body shut down again and she went into the first of three consecutive days of diabetic comas.  She was found by Security passed out and unresponsive in her cell.  Blood sugar was 16 mg/dl on this date.

23. On June 9, 2010, Weatherby went into yet another diabetic coma. At 10:30 am her blood sugar was 22 mg/dl. CCA employee Quindlynn Gray electronically signed the clinical notes relating to Weatherby's condition and treatment on June 9, 2010. CCA thus had actual knowledge that Weatherby had serious, life-threatening, and ongoing medical needs relating to her diabetes that were not being appropriately addressed. CCA knew that Weatherby was at imminent risk of neurologic complications and the risk of death.

24. Weatherby's condition was so precarious that even other inmates knew her life was in danger. On June 9, 2010, the woman residing in the cell next to Weatherby sent a letter to Plaintiffs (Weatherby's parents) informing them that Weatherby was "transferred to this unit approximately 10 days ago and has been in a fight for her life just about every day." It was readily apparent to this untrained individual that Weatherby was "in medical trouble," and she was trying to reach out for the help Weatherby was being denied at the hands of CCA.

25. On June 10, 2010, Weatherby was again found unresponsive and was removed by stretcher by prison officials. Blood sugar was reported to be less than 40 mg/dl. Believing her diabetic coma and her unresponsive state was a suicide attempt because they had not been properly trained or supervised in treating diabetic inmates, CCA's representatives transferred Weatherby to the Mountain View correctional facility for psychiatric evaluation and crisis management. Mountain View officials immediately noted that her condition was unstable and that she was "very brittle IDDM patient" and that her blood sugar had been "too high to read over last couple of days." Mountain View placed Weatherby back on insulin and began checking her blood sugar every two

hours. They noted that she was not a mental health patient, but was instead a medical patient. Using the normal foods available to the Mountain View kitchen, Mountain View also changed her diet to one that was appropriate for her brittle diabetic condition.

26. Within two days of arriving at Mountain View, Weatherby's diabetes was under control because she was being properly monitored, properly medicated with insulin, and receiving the proper nutrition.

27. By June 13, 2010, Mountain View officials noted that Weatherby was "feeling good, alert, and oriented" and that her diarrhea had virtually disappeared.

28. On June 15, 2010 Weatherby was transferred back to her UOA, Dawson State Jail, as the Mountain View unit medical provider was satisfied she was a "medically stable IDDM". That day, the clinical care notes show that CCA knew that Weatherby was an "extremely fragile diabetic" that required a "diabetic diet for her health" and needed "infirmary placement due to extreme fluctuations of blood sugar." The notes also show that Weatherby's ability to function and her levels of consciousness "changes rapidly due to blood sugar changes."

29. According to the Correctional Managed Care Formulary as promulgated by the Correctional Managed Care Pharmacy and Therapeutics Committee of the Texas Department of Criminal Justice, unstable diabetics like Weatherby require their housing assignments be made based on the severity of their condition. In Weatherby's case, the Formulary required that she must be placed in a bottom bunk due to the risk of falling. Despite these facts, Weatherby was placed in a top bunk. By 11:30 p.m. on June 15—the same day she was returned to Dawson—it is documented that Weatherby had already fallen from her top bunk. Her diarrhea had also returned.

30. The next day, prison officials at Dawson noted that she was a "brittle diabetic" with a "long history of nocturnal diarrhea due to diabetes."  Unbelievably, Weatherby was taken off a scheduled insulin dose again and placed back on oral Glyburide.

31. CCA employee Quindlynn Gray electronically signed the clinical notes relating to Weatherby's condition and treatment on June 15 and 16, 2010.  CCA thus had actual knowledge that Weatherby continued to have serious, life-threatening, and ongoing medical needs relating to her diabetes that were not being met, and CCA knew that Weatherby was not being treated in accordance with the Correctional Managed Care Formulary.

32. Shortly before 1:00 a.m. on June 22, 2010, Weatherby was found unresponsive in her cell yet again.  According to prison notes, she was "unable to respond enough to eat or drink" and prison officials were "unable to get vital signs."  911 was called and upon arrival EMS found her blood sugar to be 39 mg/dl. She was then transferred to Parkland Hospital's emergency room in Dallas. Parkland found her potassium to be 2.5 (regular 3.6-5.0).  CCA had previously discontinued her prescribed potassium medication on June 8, 2010. Within an hour, Parkland had stabilized Weatherby's condition.  Just after 2:00 a.m., she was "alert and oriented" with "normal mood and affect."

33. She returned to CCA's care at Dawson later that morning. Incredibly, between June 22, 2010 and July 14, 2010, Weatherby, a brittle diabetic, would only receive sliding scale insulin despite numerous blood sugar readings too high to even register on the glucometer.  She would be dead in less than a month.

34. On June 27, 2010 Weatherby wrote to her parents and in a telling and pleading letter told them that "I'm still alive.  I have been in and out of the hospital though. They have

cut me off of all insulin except regular though."  She also asked her parents to make sure her prescriptions were filled prior to her release so that she would have her prescribed insulin, Novolog and Lantus, waiting for her. This would be the last Plaintiffs would hear from their daughter.

35. On July 13, 2010, Weatherby's blood pressure fell to 93/43, and she was escorted to medical by concerned inmates.  Despite the fact that her condition *worsened* while she was in medical, Weatherby was given two units of insulin and was released to security and sent to her cell with a blood pressure of 78/43.  Within less than 24 hours Pamela Darlene Weatherby would be dead.

36. On July 14, 2010—barely two months after first being incarcerated—Weatherby went into yet another diabetic crisis.  It was her last.  As a result of Defendants' deliberate indifference to her serious medical needs and CCA's repeated failures to adhere to the Correctional Managed Care Formulary as promulgated by the Correctional Managed Care Pharmacy and Therapeutics Committee of the Texas Department of Criminal Justice and to provide Weatherby with nutrition prescribed for her medical condition and to supervise and train its agents regarding the Formulary, Weatherby is now dead.

37. An autopsy was conducted by the Southwestern Institute of Forensic Sciences and, based on the autopsy findings and toxicology results, Weatherby died as the result of metabolic ketoacidosis due to diabetes mellitus.  Post-mortem glucose was a stunning 780 mg/dl.

38. CCA was responsible for the training, supervision, and conduct of its officers, agents, servants, and employees who worked at the Dawson private jail.  However, CCA obviously failed to train any of its personnel how to treat inmates with diabetes, like

Weatherby, and how to provide an appropriate diet for inmates with diabetes, like Weatherby. CCA also failed to supervise the manner in which its agents and employees cared for and fed Weatherby. CCA instead tolerated and fostered an environment of disorganization within the facility, including the failure to properly staff the unit, hire competent staff personnel, and supervise and train its employees and agents.

39. CCA took no measures to ensure Weatherby's safety. Instead, it with deliberate indifference failed to properly care for an inmate with very serious medical needs.

40. CCA failed to supervise the implementation of these dietary guidelines and failed to ensure a policy was implemented at its facility that ensured inmates like Weatherby received the special diets they need not only to be healthy, but also in fact to stay alive.

41. Indeed, CCA's pattern of disregarding the serious medical needs of its diabetic inhabitants is documented by other cases filed against it. In *Copelton v. Corrections Corporation of America*, No. CV-09-10-GF-SHE, 2009 WL 4063907 (D. Mont., Nov. 23, 2009), another inmate alleged that CCA failed to provide a proper diabetic diet and that plaintiff was injured thereby.

## CAUSE OF ACTION

### Cruel and Unusual Punishment - § 1983

42. Plaintiffs incorporate paragraphs 1 - 41 above as if fully set out herein.

43. Defendant CCA violated Weatherby's constitutional and civil rights provided in the United States Constitution under the Eighth and Fourteenth Amendments. Specifically, Defendant CCA violated Weatherby's right to be free from cruel and unusual punishment by acting with deliberate indifference to her serious medical needs.

44. CCA was personally involved in the deprivation of Weatherby's constitutional rights and acted with deliberate indifference to Weatherby's serious medical needs. As the clinical notes from Dawson show, CCA employee Quindlynn Gray electronically signed the clinical notes relating to Weatherby's condition and treatment. CCA thus had actual knowledge that Weatherby continued to have serious, life-threatening, and ongoing medical needs relating to her diabetes that were not being met, and CCA knew that Weatherby was not being treated in accordance with the Correctional Managed Care Formulary. CCA was thus aware of facts from which an inference of excessive risk to Weatherby's health and safety could be drawn.

45. Indeed, CCA actually drew the inference that potential for harm to Weatherby existed, as evidenced by clinical notes signed by a CCA representative indicating that CCA knew that Weatherby was an "extremely fragile diabetic" that required a "diabetic diet for her health" and needed "infirmary placement due to extreme fluctuations of blood sugar." CCA also knew that Weatherby had repeated diabetic comas and had on more than one occasion required emergency medical care.

46. Nonetheless, CCA refused to treat Weatherby, ignored her complaints, and intentionally treated her incorrectly with wonton disregard for any serious medical needs as set out above. CCA's knowledge of the substantial risk of harm to Weatherby may be inferred by the obviousness of Weatherby's physical condition throughout her incarceration.

47. The wrongful acts and omissions of CCA constitute reckless disregard and conscious indifference to Weatherby's safety and physical wellbeing and posed a substantial risk of serious harm in violation of her right to due process of law and to be free of cruel and unusual punishment.

48. CCA, moreover, failed to implement appropriate policies that could have prevented Weatherby's death and had a pattern of disregarding the serious medical needs of its inhabitants, and its inaction in implementing these policies was the result of deliberate indifference to the rights of its inhabitants, including Weatherby. For example, CCA does not follow the Correctional Managed Care Formulary as promulgated by the Correctional Managed Care Pharmacy and Therapeutics Committee of the Texas Department of Criminal Justice. As evidenced by its treatment of Weatherby, CCA does not send patients to the Chronic Care Clinic for re-evaluation, and does not follow the appropriate treatments plans for brittle diabetics, including providing them with appropriate diets and the proper medications and dosages, or referring them to specialists when necessary. CCA, moreover, does not follow the Policy Manual regarding Therapeutic Diets for diabetics.

49. CCA, moreover, had actual and constructive notice that its employees and agents were not meeting the serious medical needs of Weatherby, but CCA failed to train or supervise its employees and agents with respect to treating the serious medical needs of diabetics like Weatherby. CCA's notice and actual knowledge of Weatherby's condition is evidenced by the fact that a CCA representative reviewed and signed notes relating to Weatherby's ongoing condition and signed off on those notes. CCA thus had actual and constructive notice that that its actions and failures were substantially certain to cause Weatherby's demise, and it consciously and deliberately chose to disregard that risk of harm.

50. In the alternative, because Weatherby's death was highly predictable and was a plainly obvious consequence of CCA's disregard of Weatherby's serious medical needs, CCA

acted with deliberate indifference even absent a pattern of similar unconstitutional behavior.  Before her death, Weatherby suffered numerous diabetic comas and had to be sent by EMS to Parkland and to another correctional facility to stabilize her.  CCA thus knew that Weatherby's health was precarious, and it was highly predictable and plainly obvious that Weatherby's life was at risk.  Indeed, CCA's employees signed off on clinical notes showing just how precarious Weatherby's health and life were.  Still, CCA acted with deliberate indifference by failing not only to provide Weatherby with the diet and care that she needed—but also by switching her to medication and the failure to follow a prescribed diet that killed her.

51. The wrongful acts and/or omissions of CCA constitute reckless disregard and conscious indifference to Weatherby's safety and physical well-being and posed a substantial risk of harm in violation of her right to due process of law and to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments of the United States Constitution.  Furthermore, the above-described wrongful acts constitute evidence that Defendants acted willfully, deliberately, maliciously, or with reckless disregard to Weatherby's safety, in violation of 42 U.S.C. § 1983.

52. CCA's pattern of unconstitutional conduct and policies were so pervasive as to constitute actual or constructive knowledge of the conduct on the part of its policy makers, whose deliberate indifference to the unconstitutional practices is evidenced by a failure to correct the situation once the need for training and supervision became obvious.  The above described acts and omissions constitute a pattern of constitutional violations and were a proximate cause of Weatherby's death.  This pattern of unconstitutional policies, procedures and neglect, included but were not limited to:

a.  Failure to provide appropriate life sustaining doses of insulin from May 28, 2010 until her death on July 14, 2010;

b.  Failure to provide the required diabetic diet as required by her medical condition from May 28, 2010 until her death on July 14, 2010;

c.  Failure to follow policies and procedures as set forth by the Correctional Managed Care Pharmacy and Therapeutics Committee of the Texas Department of Criminal Justice, US Department of Agriculture and the Department of Health and Human Services US Dietary References; and

d.  Failure to adhere to the Correctional Managed Care Formulary from May 28, 2010 until her death on July 14, 2010.

53. CCA's lack of supervision, training, and policy making was a moving force behind the constitutional violations alleged herein, and Weatherby and Plaintiffs suffered damages and injuries as a result.

54. The above-described deprivations of Weatherby's constitutional rights were a direct and proximate result of the acts, omissions, policies, and customs of CCA.  As a direct and proximate result of the constitutional violations alleged herein, Weatherby and Plaintiffs suffered great physical and mental pain, anguish, shock, agony, and ultimately, death.

55. Defendant CCA acted with an evil motive or intent or with reckless or callous indifference to Weatherby's federally protected rights.  CCA is therefore liable for punitive damages.

**AFFIRMATIVE PLEADINGS**

56. This case does not arise under Tex. Civ. Prac. & Rem. Code § 74 because it does not involve a health care liability claim, but is instead based upon Defendant's deprivation of Weatherby's right to be free from cruel and unusual punishment.

57. In the event this case is construed as arising under Tex. Civ. Prac. & Rem. Code § 74, Plaintiffs are not required to produce an expert report within 120 days because this case was filed in federal court. *See e.g. Toler v. Sunrise Senior Living Services, Inc.,* SA-06-CV-0887-XR, 2007 WL 869581 at *4 (W.D. Tex., March 21, 2007).

## DAMAGES

### A.    Survival Damages to Estate of Pamela Darlene Weatherby

58. As a direct and proximate result of the acts and/or omissions of Defendant, as set forth above, Pamela Darlene Weatherby's estate, pursuant to Texas Civil Practice and Remedies Code § 71.021 – the Survival Statute, is entitled to recover the following elements of damage:

a.    Physical pain and suffering sustained by Pamela Darlene Weatherby from May 28, 2010 until the time of her death;

b.    Mental anguish sustained by Pamela Darlene Weatherby from May 28, 2010 until the time of her death;  and

c.    Reasonable funeral and burial expenses.

### B.    Wrongful Death Damages of Leon Alfano, Nelda Alfano:

59. As a direct and proximate result of the acts and/or omissions of Defendant, as set forth above, Leon Alfano and Nelda Alfano, as the surviving parents of Pamela Darlene Weatherby, are entitled to recover the following elements of damage:

a.    Loss of companionship, love, comfort, and consolation sustained in the past;

b.     Loss of companionship, love, comfort and consolation that will, in reasonable probability, be sustained in the future;

c.     Mental anguish, grief, and bereavement sustained in the past;

d.     Mental anguish, grief, and bereavement that will, in reasonable probability, be sustained in the future;

e.     Loss of companionship or society sustained in the past;

f.     Loss of companionship or society that will, in reasonable probability, be sustained in the future;

g.     Termination of the parent-child relationship sustained in the past, and that will, in reasonable probability, be sustained in the future;

h.     Loss of household services sustained in the past, and that will, in reasonable probability, be sustained in the future;

i.     Loss of support sustained in the past, and that will, in reasonable probability, be sustained in the future;

j.     Loss of advice and counsel sustained in the past, and that will, in reasonable probability, be sustained in the future;

k.     Loss of financial contributions sustained in the past, and that will, in reasonable probability, be sustained in the future; and

l.     Loss of inheritance.

**C.**     **<u>Wrongful Death Damages of Daren C. Weatherby and Justin Weatherby:</u>**

60. As a direct and proximate result of the acts and/or omissions of Defendant, as set forth above, Daren C. Weatherby and Justin Weatherby, as surviving children of Pamela Darlene Weatherby, are entitled to recover the following elements of damage:

a.      Loss of companionship, love, comfort, and consolation sustained in the past;

b.      Loss of companionship, love, comfort and consolation that will, in reasonable probability, be sustained in the future;

c.      Mental anguish, grief, and bereavement sustained in the past;

d.      Mental anguish, grief, and bereavement that will, in reasonable probability, be sustained in the future;

e.      Loss of companionship or society sustained in the past;

f.      Loss of companionship or society that will, in reasonable probability, be sustained in the future;

g.      Termination of the parent-child relationship sustained in the past, and that will, in reasonable probability, be sustained in the future;

h.      Loss of household services sustained in the past, and that will, in reasonable probability, be sustained in the future;

i.      Loss of support sustained in the past, and that will, in reasonable probability, be sustained in the future;

j.      Loss of advice and counsel sustained in the past, and that will, in reasonable probability, be sustained in the future;

k.      Loss of financial contributions sustained in the past, and that will, in reasonable probability, be sustained in the future; and

l.      Loss of inheritance.

### D.   **Exemplary Damages**

61. Defendant CCA acted with an evil motive or intent or with reckless or callous indifference to Weatherby's federally protected rights.  CCA is therefore liable for

punitive damages.  The Court should assess exemplary damages against Defendant in an amount that will punish Defendant and deter others from engaging in similar callous conduct.

## JURY DEMAND

62. Plaintiffs demand a trial by jury and tender the appropriate fee.

## PRAYER FOR RELIEF

WHEREFORE, after trial of this case, Plaintiffs respectfully request a judgment for Plaintiffs including

    a.  an award of economic and non-economic, general and special, actual, incidental, consequential, exemplary, and all other damages to which they are entitled;

    b.  an award of pre-judgment and post-judgment interest;

    c.  An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

    d.  All such other and further legal and equitable relief as this Court deems just and proper.

Respectfully submitted,

By: s/  Joel M. Fineberg
Joel M. Fineberg
Texas Bar No. 07008520
Email:  jfineberg@fineberglaw.com
Stuart L. Cochran
Texas Bar No. 24027936
Email:  scochran@fineberglaw.com
**JOEL M. FINEBERG, P.C.**
6900 Dallas Parkway, Suite 200
Plano, Texas  75024

Telephone:      (214) 219-8828
Facsimile:      (214) 219-8838

Paula F. Sweeney
Texas Bar No.  07044300
**SLACK & DAVIS, L.L.P.**
2911 Turtle Creek Blvd.,
Suite 1400
Dallas, Texas  75219
Telephone:  214-528-8686
psweeney@slackdavis.com

**COUNSEL FOR PLAINTIFFS**